* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Houser. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Houser with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, which has jurisdiction of the parties and of the subject matter.
2. On June 27, 2003, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On June 27, 2003, defendant-carrier Commercial Underwriters was the carrier on the risk for defendant-employer, Excel Body Works, Inc.
4. At the hearing, the parties submitted a Packet of Medical and Rehabilitation Records, which was admitted into the record, and marked as Stipulated Exhibit (2).
5. The issues to be determined are as follows:
 a. whether the death of the David William Kay, Jr. arose out of and in the course of his employment with defendant-employer;
 b. whether the minor Chelsey Inman is the child of David William Kay, Jr.;
 c. whether the minor Chelsey Inman was dependant on David William Kay, Jr. at the time of his death;
 d. what is the deceased-employee's correct average weekly wage, and;
 e. to what amount of death benefits, if any, is the minor Chelsey Inman entitled.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Mr. David William Kay, Jr., hereinafter the deceased-employee, was killed in an automobile collision on June 27, 2003. On that date, the deceased-employee was a passenger in a vehicle driven by Mr. Bobby Bullard. The deceased-employee was born on December 4, 1982, and was twenty (20) years old at the time of his death.
2. Defendant-employer is an automobile collision repair business, usually employing approximately twelve employees. Defendant-employer is owned by Mr. Charles Kay, who is also the deceased-employee's uncle. Ms. Brenda Kay is the wife of Mr. Charles Kay, aunt of the deceased-employee, and an employee of defendant-employer. Ms. Margaret Kay is the mother of Mr. Charles Kay, and also works for defendant-employer. Ms. Brenda Kay and Ms. Margaret Kay work in defendant-employer's office handling administrative matters.
3. The deceased-employee primarily worked for defendant-employer in its paint prep area, but also assisted with cleaning the shop, taking out trash and performing whatever he was instructed to do by his bosses. At the time of his death, the deceased-employee had worked for defendant-employer continuously since January 2003. The deceased-employee's work schedule for defendant-employer was Monday through Friday, usually from 8:00 a.m. to 6:00 p.m.
4. Mr. Bobby Bullard testified by deposition in this matter at his place of incarceration where he is serving a sentence in relation to the automobile accident that resulted in the deceased-employee's death. Mr. Bullard previously has worked for Mr. Charles Kay and defendant-employer, with the periods of his employment being sporadic. Some of Mr. Bullard's statements at his deposition regarding the relationship between the work he and the deceased employee were performing for Mr. Charles Kay and defendant-employer on the date in question directly contradict earlier statements he gave in a recorded statement taken by plaintiff's prior counsel. To the extent that Mr. Bullard's deposition testimony contradicts assertions in his earlier recorded statement, more weight is given to his recorded statement answers.
5. When Mr. Bullard was working for defendant-employer, he primarily performed sanding and prep work, but also did any other tasks he was instructed to perform by Mr. Charles Kay. When working for defendant-employer, Mr. Bullard usually worked as a helper for Mr. Howard Graham. When he and the deceased-employee worked for defendant-employer at the same time, Mr. Charles Kay periodically would instruct them to perform tasks other than paint prep work. Additionally, according to Mr. Bullard, when work at the shop was slow, Mr. Charles Kay would instruct the deceased-employee and Mr. Bullard to mow the lawn or cut weeds at the shop, or at his residence.
6. On the evening prior to the automobile accident, Mr. Bullard worked at defendant-employer's shop, and the deceased-employee stayed with Ms. Candice Inman, mother of the child for whom recovery is sought in this matter. According to Ms. Candice Inman, the deceased-employee departed for work at approximately 6:50 a.m. on June 27, 2003. Because the deceased-employee had lost his license several months before, he left his truck at Ms. Inman's home so she could have transportation. During the period immediately preceding his death, the deceased-employee would normally be driven from Ms. Candice Inman's home to the home of Ms. Margaret Kay, from where he would then be transported to defendant-employer's shop.
7. On June 27, 2003, Mr. Bullard arrived at defendant-employer's shop at approximately 7:55 a.m. Also on that date, Ms. Brenda Kay arrived at the shop at approximately 9:00 a.m., by which time the deceased-employee was also present. According to Mr. Bullard, he and the deceased-employee were seen by Mr. Graham at defendant-employer's shop on the morning in question. Because work had been performed late into the evening on the previous day, there was little if any regular work to be performed at the shop on June 27, 2003. Accordingly, through Ms. Brenda Kay, Mr. Charles Kay instructed Mr. Bullard and the deceased-employee to travel to his residence and to work on the yard and lawn. Ms. Brenda Kay drove to the residence separately from the deceased-employee, who rode in Mr. Bullard's vehicle. On her way to the residence, Ms. Brenda Kay stopped for some chain saws and gas for the deceased-employee and Mr. Bullard to use in their work.
8. According the credible evidence of record, due to the size of the yard, the work Mr. Bullard and the deceased employee were to perform would take most of a regular workday.
Prior to arriving at the residence, Mr. Bullard and the deceased-employee stopped at a friend's house, and then stopped to purchase two twenty-four (24) ounce cans of beer, both of which Mr. Bullard drank. Upon arrival at their bosses' residence, Mr. Bullard testified that he began mowing the grass while the deceased-employee used a weed-eater. They worked for approximately one hour before Ms. Brenda Kay arrived with more gas for the mowers. After unloading Ms. Brenda Kay's car, Mr. Bullard and the deceased-employee took a break during which they purchased an eighteen pack of beer. Once Ms. Brenda Kay departed the residence, she proceeded to defendant-employer's shop in Jacksonville, taking the only possible route from her home on N.C. Highway 24. Along her route, she passed by the exact location where the deceased-employee died in the motor vehicle accident later in the day.
9. At approximately 2:00 p.m. on the afternoon in question, Mr. Bullard decided to stop working at the residence and was in the process of returning the deceased-employee to defendant-employer's shop when he veered to avoid a collision with a van, ran off the road and crashed into a tree. The deceased-employee died as the direct result of this vehicle accident.
10. Prior to the accident, the deceased-employee had worked two or three hours at his bosses' residence. At the time of his recorded statement, Mr. Bullard had no doubt that on June 27, 2003, he and the deceased-employee were performing work for defendant-employer in the same manner in which they had previously when regular work at the shop was not available. Based upon the credible evidence of record, had work at the shop been available the morning of June 27, 2003, the deceased-employee would have been expected to clock in. The fact that he did not, and instead performed work for his boss at his bosses' residence is not determinative on the issue of whether his death arose out of and in the course and scope of his employment with defendant-employer. As with other days when regular work was not available, or when defendant-employer's owner determined that non-traditional work needed to be performed, on
June 27, 2003, the deceased-employee adhered to the instructions of his boss. The fact that his boss and his wife were relatives to whom he may have "owed" favors for their assistance or for damage to the family boat is also not determinative on the issue of whether his death arose out of and in the course and scope of his employment with defendant-employer.
11. The fact that the deceased-employee and Mr. Bullard had taken a break earlier in the day and while on said break bought, and then began drinking an eighteen pack of beer is immaterial as to whether the deceased-employee's death was compensable. The deceased-employee was not driving the vehicle and the accident occurred on the most direct route from where he had been working at the residence to the shop. Defendants' attempt to focus on this purchase and use of beer and other past transgressions of the deceased-employee is immaterial, having no reasonable legal basis, as the deceased employee's intoxication was not a proximate cause of his death.
12. Moreover, at the hearing, defendant-employer's principals, Mr. Charles Kay, Ms. Brenda Kay and Ms. Margaret Kay, displayed much concern that their business not lose this case and face possible rate increases while at the same time finding no difficulty in creating a moralistic and legally irrelevant smoke screen regarding the character of the deceased-employee, their nephew and family grandson. Accordingly, the testimony of Mr. Charles Kay, Ms. Brenda Kay and Ms. Margaret Kay is not given weight by the undersigned.
13. Based upon the totality of the credible evidence of record, the status of Mr. Charles Kay, Ms. Brenda Kay and Ms. Margaret Kay and defendant-employer in relation to the deceased-employee and whether his death was compensable are indistinguishable. On the date of his death, the deceased-employee was performing work pursuant to direct instructions of his bosses with said work being of benefit to his bosses and therefore, also to defendant-employer. Accordingly, the undersigned finds that at the time of his death, the deceased-employee was an employee of defendant-employer while he was performing this special errand for his bosses and defendant-employer.
14. On June 27, 2003, the deceased-employee sustained an injury by accident arising out of and in the course of his employment with defendant-employer that resulted in his death.
15. Ms. Candice Inman and the deceased-employee worked together in high school and began dating in April 2001. The couple dated for approximately two and one-half years. In July 2002, the couple temporarily ended their relationship for approximately two months, eventually reuniting towards the end of August or early September 2002. When Ms. Candice Inman and the deceased-employee first reunited, the evidence is that they had sexual intercourse without any birth control measures having been taken.
16. On October 18, 2002, Ms. Candice Inman learned that she was pregnant after she and the deceased-employee had traveled to Morehead City for a pregnancy test. In December 2002, the deceased-employee moved in with Ms. Candice Inman and her mother, Ms. Wanda Inman in Swansboro. Through Ms. Candice Inman's delivery date, the deceased employee resided either at the Inman home, or when it was necessary for transportation to work for defendant-employer, with Mrs. Margaret Kay.
17. Ms. Candice Inman was visiting the deceased-employee at the home of Ms. Margaret Kay when she went into labor. The deceased-employee traveled with Ms. Candice Inman to the hospital where Chelsey Inman was born on June 14, 2003. Except for leaving to go home on one occasion to bathe, the deceased-employee remained at the hospital until Ms. Candice Inman and Chelsey Inman were discharged.
18. Following the birth of Chelsey Inman, the deceased-employee acknowledged to a nurse at the hospital that he was the Chelsey's father. Additionally, the deceased-employee accepted and wore the hospital bracelet given to the father of the child and is visibly excited about the birth of Chelsey on the Videotape, which is part of the record, marked as Plaintiff's Exhibit (12). Once Ms. Candice Inman and Chelsey Inman were released from the hospital, deceased-employee returned to the Inman home and stayed there every night until the date of his death, except one.
19. The totality of the credible evidence of record establishes that at the time of deceased-employee's death, Chelsey Inman was his acknowledged illegitimate child. Accordingly, a ruling on the Motion to Exhume his body is rendered moot.
20. As the acknowledged illegitimate child of the deceased-employee, the minor child Chelsey Inman is conclusively presumed to have been wholly dependent for support upon the deceased-employee.
21. As the only person to have been wholly dependent upon the deceased-employee at the time of his death, Chelsey Inman is entitled to receive for her benefit and use death benefits at the applicable rate and at the exclusion of all others until she reaches eighteen (18) years of age.
22. Based upon the best available evidence of record, the deceased-employee did not work an entire fifty-two (52) week period prior to his death. Accordingly, method one as prescribed in N.C. Gen. Stat. §97-2(5) can not be used to calculate his average weekly wage, nor can method two.
23. Also based upon the best available evidence of record, the deceased-employee worked for defendant-employer from January 1, 2003 through June 27, 2003, although he was not paid for the hours he worked on June 27, 2003. The days during this period total one-hundred and seventy-nine (179), which equates with twenty-five and four-sevenths (25 4/7ths) weeks. The deceased employee's total income during this same period totaled $10,188.50. Pursuant to method three as prescribed in N.C. Gen. Stat. § 97-2(5), his total earnings of $10,188.50 are to be divided by the number of weeks and parts thereof that he did work, which is twenty-five and four-sevenths (25 4/7ths). This calculation gives the deceased-employee an average weekly wage of $398.45, which yields a compensation rate of $265.77.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Pursuant to N.C. Gen. Stat. § 97-2(5), method three must be used to calculate the deceased-employee's average weekly wage as methods one and two are inapplicable under the facts of this case. N.C. Gen. Stat. §97-2(5). Using method three, on June 27, 2003, the deceased-employee's average weekly wage was $398.45, which yields a compensation rate of $265.77. Id.
2. On June 27, 2003 the deceased-employee was performing work pursuant to direct instructions of his bosses with said work being of benefit to his bosses and defendant-employer, the undersigned concludes that at the time of his death, the deceased-employee was an employee of defendant-employer while he was performing this special errand for his bosses and defendant-employer. N.C. Gen. Stat. § 97-2(2).
3. On June 27, 2003, the deceased-employee sustained an injury by accident arising out of and in the course of his employment with defendant-employer that resulted in his death. N.C. Gen. Stat. §§ 97-2(6);97-38.
4. At the time of deceased-employee's death, Chelsey Inman was his acknowledged illegitimate child. N.C. Gen. Stat. §§ 97-2(12);97-39.
5. As the acknowledged illegitimate child of the deceased-employee, Chelsey Inman is conclusively presumed to have been wholly dependent on him for support, thereby entitling her to receive at the exclusion of all others benefit payments at the rate of $265.77 per week commencing as of June 27, 2003 and continuing until she reaches she reached eighteen (18) years of age. N.C. Gen. Stat. §§ 97-2(12); 97-38; 97-39.
6. As the result of the deceased-employee's June 27, 2003 injury by accident that resulted in his death, plaintiffs are entitled to have defendants pay for all related medical expenses. N.C. Gen. Stat. § 97-25.
7. As the result of the deceased employee's June 27, 2003 injury by accident that resulted in his death, plaintiffs are entitled to have defendants pay for burial expenses pursuant to the terms of N.C. Gen. Stat. § 97-38.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay or cause to be paid to Ms. Candice Inman, as the natural guardian and mother of Chelsey Inman, a minor, to be used and applied for her benefit, the sum of $265.77 per week commencing as of June 27, 2003 and continuing until the minor reaches eighteen (18) years of age, subject to the attorney fee awarded herein.
2. Defendants shall pay for all related medical expenses incurred as the result of the deceased-employee's June 27, 2003 injury by accident that resulted in his death.
3. Defendants shall pay burial expenses pursuant to the terms of N.C. Gen. Stat. § 97-38 as the result of the deceased employee's June 27, 2003 injury by injury by accident that resulted in his death.
4. A reasonable attorney fee for plaintiff's counsel of twenty-five percent (25%) of the compensation due plaintiff under Paragraph 1 of this AWARD is approved and shall be paid as follows: twenty-five percent (25%) of the lump sum due plaintiff shall be deducted from said sum and paid directly to plaintiff's counsel; thereafter, defendants shall pay every fourth check directly to plaintiff's counsel.
5. Defendants shall pay the costs.
This the __ day of January, 2006.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER